

1  Stephen R. Hormel, WSBA #18733
   Hormel Law Office
2  17722 E. Sprague Ave.
   Spokane Valley, WA 99016
3  Telephone: (509) 926-5177
4  Email: steve@hormellaw.com

5  *Attorney for Defendants Joshua Wesley Owens*
   *and Diesel Truck Products, Inc.*
6  *[Additional counsel listed on signature page]*

7  Andrew M. Wagley, WSBA #50007
8  Etter, McMahon, Lamberson, Van Wert & Oreskovich, P.C.
   618 W. Riverside Avenue, Suite 210
9  Spokane, WA 99201
   Telephone: (509) 747-9100
10 Email: awagley@ettermcmahon.com

11
12 *Attorney for Defendants John Wesley Owens*
   *and Fulfillment Solutions & More, LLC*
13 *[Additional counsel listed on signature page]*

14         IN THE UNITED STATES DISTRICT COURT
15       FOR THE EASTERN DISTRICT OF WASHINGTON

16 UNITED STATES OF AMERICA,          Case No. 2:24-CR-140-TOR-1

17         Plaintiff,                 **DEFENDANTS' MOTION TO
                                      DISMISS INDICTMENT FOR
18       v.                           FAILURE TO STATE AN
                                      OFFENSE**
19 JOHN WESLEY OWENS *et al.*,
                                      **ORAL ARGUMENT REQUESTED**
20         Defendants.

21
22
23
24
25
26

FIRM:68746583v1

MOTION TO DISMISS INDICTMENT

**TABLE OF CONTENTS**

Page

I.     MOTION ................................................................................................1

II.    PRELIMINARY STATEMENT ..............................................................1

III.   BACKGROUND .....................................................................................3

       A.    The Clean Air Act is structured by way of different titles
             regulating different things, with, for instance, Title I regulating
             "stationary sources" and Title II regulating "mobile sources." ...........3

       B.    The Act contains various provisions related to OBD systems..............4

       C.    The Government inexplicably, and without any intervening
             amendment to the Act, changes its position on criminal
             enforcement of Title II in 2020. ..........................................................5

       D.    In the Indictment, the government—apparently based on the
             "Enforcement Alert"—attempts to transform civil violations
             into the felonies. .................................................................................8

IV.    LEGAL STANDARD ..............................................................................9

V.     THE CLEAN AIR ACT COUNTS MUST BE DISMISSED....................10

       A.    OBD systems are not "required to be maintained" under the
             Act, and thus the Act does not criminalize tampering with them.......10

       B.    OBD systems are not "monitoring devices" under the Act, and
             thus the Act does not criminalize tampering with them.....................13

       C.    The Act, read in its entirety, cannot be interpreted to criminalize
             the charged conduct............................................................................15

             1.    By its own terms, Section 7413 does not apply to conduct
                   regulated under Title II. .............................................................15

             2.    Section 7413(c)(2)(C)'s "under this chapter" language is
                   too thin a reed on which to grant the government the
                   expansive criminal prosecution authority it seeks. ..................15

             3.    Besides being contrary to the plain language of the
                   statute and a decades long enforcement policy, the

government's new-found felony theory would lead to absurd results...................................................................18

VI.    THE SMUGGLING COUNTS MUST BE DISMISSED............................19

    A.    Smuggling is prohibited by Title 18, United States Code, Section 545, which requires the importation be "contrary to law.".......................................................................20

    B.    The smuggling charge here fails because the government has not—and cannot—identify any law that prohibited the "importation" of defeat devices or delete tuners, let alone a criminal law prohibiting such importation...........................21

VII.   THE MONEY LAUNDERING COUNT MUST BE DISMISSED.............25

VIII.  CONCLUSION.............................................................26

**<u>TABLE OF AUTHORITIES</u>**

**Federal Cases**

*Current v. United States*, 287 F.2d 268 (9th Cir. 1961) ..........................................22

*FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120 (2000).....................17

*Hamling v. United States*, 418 U.S. 87 (1974) ..............................................11

*Keck v. United States*, 172 U.S. 434 (1899) ..................................................22

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................19

*Lyng v. Payne*, 476 U.S. 926 (1986)............................................................18

*Massy v. United States*, 214 F.2d 935 (8th Cir. 1954)..........................................12

*Nat'l Envtl. Dev. Corp. v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) .............................18

*Olais-Castro v. United States*, 416 F.2d 1155 (9th Cir. 1969) ......................... 21-23

*Roseman v. United States*, 364 F.2d 18 (9th Cir. 1966) ........................................21

*Russell v. United States*, 369 U.S. 749 (1962)..................................................11

*Steiner v. United States*, 229 F.2d 745 (9th Cir. 1956).........................................23

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598
    (D.C. Cir. 1992) ........................................................................18

*United States v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008)..........................*Passim*

*United States v. Bass*, 404 U.S. 336 (1971)......................................................11, 17

*United States v. Bittner*, 598 U.S. 85 (2023) ..................................................17

*United States v. Bittner*, 598 U.S. 97 (2023) ............................................... 1, 18-19

*United States v. Buckley*, 689 F.2d 893 (9th Cir. 1982) ........................................10

*United States v. Carroll*, Criminal No. 21-532, 2024 WL 4039807 (E.D. Mo.
    Sept. 4, 2024) ...........................................................................13

*United States v. Castaneda-Nicolas*, 535 F. Supp. 3d 1059 (E.D. Wash.
    2021) ....................................................................................10

*United States v. Coiteux*, Criminal No. 21-5184, 2024 WL 1998417 (W.D.
    Wash. May 6, 2024), appeal docketed Case No. 24-6945 (9th Cir. Nov.
    15, 2024) .........................................................................13, 15, 17

*United States v. D'Alessio*, 822 F. Supp. 1134 (D.N.J. 1993)...............................26

*United States v. Dorenkamp*, Criminal No. 16-20394, 2018 WL 3127224 (Fifth Superseding Indictment) (E.D. Mich. Mar. 14, 2018) ...............................7

*United States v. Hardy*, 289 F.3d 608 (9th Cir. 2002).................................17

*United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013)................... 20, 22, 25-26

*United States v. Korotkiy*, 118 F.4th 1202 (9th Cir. 2024)............................12

*United States v. La. Pac. Corp.*, 908 F. Supp. 835 (D. Colo. 1995).....................11

*United States v. Lawson*, 377 F. App'x 712 (9th Cir. 2010) ............................22, 24

*United States v. Lawson*, 618 F. Supp. 2d 1251 (E.D. Wash. 2009) .....................21

*United States v. Long*, Criminal No. 22-139, 2024 WL 4711946 (E.D. Va. Nov. 7, 2024) ..........................................................13, 15, 17

*United States v. Sterling Islands, Inc.*, 391 F. Supp. 3d 1027 (D.N.M. 2019) ........22

*United States v. Teh*, 535 F.3d 511 (6th Cir. 2008) ..................................24

*United States v. Thomsen*, 830 F.3d 1049 (9th Cir. 2016)..............................12

*United States v. White*, 87 F. App'x 566 (6th Cir. 2004) .............................24

*Van Buren v. United States*, 593 U.S. 374 (2021) ...................................14

*W. Va. v. EPA*, 597 U.S. 697 (2022).......................................... 2, 17-18

*Weiler v. Chatham Forest Prods., Inc.*, 392 F.3d 532 (2d Cir. 2004).....................3

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001)..................................17

*Ysleta del Sur Pueblo v. Tex.*, 596 U.S. 685 (2022) .................................13

**Federal Statutes**

18 U.S.C. § 2 .................................................................8

18 U.S.C. § 371 ...............................................................8

18 U.S.C. § 545 ..........................................................*Passim*

18 U.S.C. § 548 ..............................................................24

18 U.S.C. § 1956 .............................................................26

18 U.S.C. § 1956(a)(1)(A)(i) .................................................10

18 U.S.C. § 1956(h) .......................................................8, 10

1   42 U.S.C. § 7403(c) ....................................................................................2, 14

2   42 U.S.C. § 7410(a)(2)(F)(i) ...............................................................12

3   42 U.S.C. § 7411 .........................................................................................3

4   42 U.S.C. § 7411(a)(3) ...........................................................................3

5   42 U.S.C. § 7412 .........................................................................................3

6   42 U.S.C. §7412(f)(4)(B) .........................................................................12

7   42 U.S.C. § 7413 ....................................................................................4, 16

8   42 U.S.C. § 7413(a)(3)(D) ................................................................4, 16

9   42 U.S.C. § 7413(c)(2)(C) .............................................................. Passim

10  42 U.S.C. § 7413(f) ..................................................................................16

11  42 U.S.C. § 7414 ........................................................................................4

12  42 U.S.C. § 7414(a)(1) .......................................................................4, 12

13  42 U.S.C. § 7414(a)(2)(A) ......................................................................12

14  42 U.S.C. § 7521 ....................................................................................3, 6

15  42 U.S.C. § 7521(d)(1) ..............................................................................5

16  42 U.S.C. § 7521(m)(1) ......................................................................5, 11

17  42 U.S.C. § 7521(m)(3) .............................................................................5

18  42 U.S.C. § 7522 .............................................................................. Passim

19  42 U.S.C. § 7522(a)(1) ............................................................................25

20  42 U.S.C. § 7522(a)(3)(A) ..................................................................... 5-6

21  42 U.S.C. § 7522(a)(3)(B) ...........................................................5-6, 20, 23

22  42 U.S.C. § 7524 ......................................................................................16

23  42 U.S.C. § 7525(c) ...................................................................................4

24  42 U.S.C. § 7542 ........................................................................................4

25  42 U.S.C. § 7543(b) .................................................................................19

26  42 U.S.C. § 7547(d) .................................................................................25

**State Regulations**

Cal. Code Regs. § 1968.2(k) ................................................................20

**Rules**

Fed. R. Crim. P. 7(c)(1) ....................................................................10

Fed. R. Crim. P. 12(b)(3) ................................................................1, 3

**Federal Regulations**

40 C.F.R. § 64.1 ................................................................................14

40 C.F.R. § 82.4 ................................................................................21

40 C.F.R. § 85 ...................................................................................24

40 C.F.R. § 85.1501(a) ......................................................................24

40 C.F.R. § 85.1513(a) ......................................................................25

40 C.F.R. § 86.1801-12 .......................................................................5

40 C.F.R. § 86.1806-17 ..................................................................5, 20

40 C.F.R. § 86.1806-27 .......................................................................5

40 C.F.R. § 1036.110 ..........................................................................5

40 C.F.R. § 1036.115(h) ....................................................................25

40 C.F.R. § 1036.825 .........................................................................18

40 C.F.R. § 1068.30 ...........................................................................25

40 C.F.R. § 1068.125 .........................................................................18

40 C.F.R. § 1068.301(b) .....................................................................24

40 C.F.R. § 1068.335(a) .....................................................................25

61 Fed. Reg. 53,371 (Oct. 11, 1996) ..................................................19

**Other Authorities**

EPA, *Clean Air Act Amendments of 1989, Section-By-Section Analysis* (July 1989) .............................................................................................7

EPA Memorandum to Regional Criminal Enforcement Counsels, re: New Criminal Enforcement Responsibilities Under 1990 Clean Air Act Amendments (Apr. 19, 1993) .......................................................................7

EPA-300-F-20-001, *Enforcement Alert: Aftermarket Defeat Devices and Tampering are Illegal and Undermine Vehicle Emissions Controls* (Dec. 2020) ..................................................................................7

H.R. Rep. No. 95-294 (1977).........................................................6

S. Rep. No. 101-228 (1990) ...........................................................15

## I.  <u>MOTION</u>

COME NOW, Defendants John Wesley Owens, Joshua Wesley Owens, Diesel Truck Products, Inc., and Fulfillment Solutions & More, LLC ("Defendants"), by and through undersigned counsel, and hereby move the Court to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure ("FRCRP") 12(b)(3) for failure to state an offense.

## II.  <u>PRELIMINARY STATEMENT</u>

Defendants face six felony counts because the U.S. Environmental Protection Agency ("EPA") recently announced a novel (and untenable) interpretation of the Clean Air Act (the "Act" or "CAA") to criminalize conduct that it previously (and rightly) considered only a civil matter—the sale of parts designed to modify a vehicle's on-board diagnostic ("OBD") system. The government's charging theory conflicts with the text, structure, and history of the Act. It runs contrary to EPA's regulations, enforcement practice, and longtime interpretation of the Act. And, most importantly, it leaves regulated persons like the Owenses feeling whipsawed, exposing them to criminal liability without fair warning "of what the law intends to do if a certain line is passed." *United States v. Bittner*, 598 U.S. 97, 103 (2023) (quotation omitted). Accordingly, the Indictment should be dismissed.

***First***, the Act only criminalizes tampering with devices "required to be maintained" under the Act. 42 U.S.C. § 7413(c)(2)(C). No provision of the Act requires anyone to "maintain" an OBD system. In the few cases charging a violation of the provision at issue, the parties did not raise, and the district court did not address, this element of the statute. The government can point to no provision of the Act that requires anyone, let alone the Owenses, to maintain an OBD system.

***Second***, Title 42, United States Code, Section 7413(c)(2)(C) applies only to "monitoring devices," but OBD systems are not monitoring devices within the

1    meaning of the Act. Simply put, just because OBD systems monitor ***something*** does
2    not mean that they monitor the thing required to be monitored under the Act, *i.e.*,
3    emissions or data relating to emission output. The Indictment makes the Owenses'
4    point, to wit: In Paragraph 16, the grand jury alleges that "OBD systems must be
5    capable of monitoring all ***emission-related engine systems or components***," but the
6    Act uses the term "monitoring" to refer to the monitoring of emissions or air
7    pollutants themselves, not sundry other systems or components. *E.g.*, 42 U.S.C. §
8    7403(c) ("monitoring . . . air pollutants").

9    ***Third***, in addition to the plain text of Section 7413(c)(2)(C), all other
10   indicators—from the government's decades long enforcement practice, to
11   statements from EPA and congressional enactments—show Congress did not intend
12   OBD system modification to be subject to criminal enforcement. Confronted with
13   the government's thirty-year, uninterrupted enforcement practice, the Court should
14   approach the government's about-face with "skepticism" and require the
15   government to point to "clear congressional authorization" for the expansive power
16   it now seeks. *W. Va. v. EPA*, 597 U.S. 697, 723 (2022). The government can point
17   to, at most, an ambiguous phrase in the Act and a sub-regulatory "guidance"
18   document to support its newfangled interpretation. This will not do, particularly in a
19   criminal prosecution in which the rule of lenity applies.

20   The government's smuggling charges in Counts Three through Five are
21   similarly infirm—they are premised on conduct that can only give rise to ***civil***, not
22   ***criminal***, liability, and therefore cannot serve as the basis for a smuggling
23   prosecution. The smuggling statute, 18 U.S.C. § 545, penalizes importing
24   merchandise "contrary to law." But the government can point to no law that
25   proscribes the ***importation*** of defeat devices or delete tuners—let alone a law that
26   imposes criminal penalties. And, because the smuggling charges fail, the Indictment

fails to allege a "specified unlawful activity" to sustain its money laundering conspiracy charges in Count Six, given that the supposed "smuggling" is the only specified unlawful activity identified in the Indictment.

Accordingly, Defendants respectfully move the Court to dismiss the Indictment pursuant to FRCRP 12(b)(3) for failure to state an offense.

## III.    <u>BACKGROUND</u>

### A.    The Clean Air Act is structured by way of different titles regulating different things, with, for instance, Title I regulating "stationary sources" and Title II regulating "mobile sources."

The Act "created a complex and comprehensive legislative scheme to protect and to improve the nation's air quality." *Weiler v. Chatham Forest Prods., Inc.*, 392 F.3d 532, 534 (2d Cir. 2004) (citation omitted). The 1970 amendments organize the Act into several titles. The most comprehensive are Titles I and II, which focus on "stationary sources" and "mobile sources" of emissions, respectively. *Id.* Stationary sources under Title I include physical facilities that emit air pollutants, such as fossil fuel power plants, incinerators, and blast furnaces. 42 U.S.C. § 7411(a)(3). Conversely, Title II regulates emissions from "mobile sources," such as motor vehicles, trains, and airplanes.

Title I and Title II have separate and distinct requirements for the regulation of stationary sources and mobile sources, including different requirements for:

- the establishment of emissions and performance standards, compare 42 U.S.C. §§ 7411, 7412, with 42 U.S.C. § 7521;

- recordkeeping and reporting, compare 42 U.S.C. § 7414, with 42 U.S.C. § 7542; and

- enforcement, compare 42 U.S.C. § 7413, with 42 U.S.C. § 7522.

Throughout the Act, Congress explicitly directed EPA to regulate stationary sources differently than mobile sources. For example, Congress authorized EPA

1   under Title I to require "any person who owns or operates any emission source" or

2   "who manufactures emission control equipment or process equipment" to "install,

3   use, and maintain [emission control] monitoring equipment," but specifically

4   exempted motor vehicle manufacturers from such monitoring requirements.

5   42 U.S.C. § 7414(a)(1) (carving out "a manufacturer subject to the provisions of

6   section 7525(c) or 7542 of this title with respect to a provision of subchapter II").

7   Congress also granted EPA authority to request criminal enforcement and to pay

8   informants with respect to violations of Title I (among other provisions of the Act)

9   but withheld that authority with respect to Title II. *See id.* § 7413(a)(3)(D), (f). This

10  makes eminent sense—as will be shown, violations of Title II do not give rise to

11  criminal liability, and so there would be no need for such authority.

12       **B.    The Act contains various provisions related to OBD systems.**

13       On-board diagnostic ("OBD") systems are "composed of software and

14  sensors" that operate within a vehicle's engine control module to ensure the vehicle's

15  emissions control system continues to operate properly. (Indictment, ECF No. 1, ¶¶

16  16–17.) In the event of a malfunction, the OBD system causes a "malfunction

17  indicator light" to appear on the vehicle's dashboard—the familiar "check engine"

18  light. (*Id.* ¶ 17.) As the government acknowledges, OBD systems can cause vehicles

19  to be less fuel efficient, reduce horsepower, and increase repair and maintenance

20  costs. (*Id.* ¶ 19.) In response, some vehicle owners have engaged in a practice known

21  as "deleting and tuning" to disable the OBD system. (*Id.* ¶¶ 20–25.)

22       The Act contains three provisions relating to OBD systems. First, Title II

23  requires manufacturers to "install"—but not "maintain"—OBD systems in new

24  light-duty vehicles. 42 U.S.C. § 7521(d)(1), (m)(1).[1] Second, Title I requires States

25  _____

26  [1]Although the government correctly acknowledges in the Indictment that the Act and EPA
    regulations only require manufacturers to ***install***, rather than ***maintain***, OBD systems, the
    government incorrectly alleges that such requirement applies to all vehicles. (*See* Indictment ¶ 16.)

1  with high-pollution areas to inspect OBD systems as part of their State
2  Implementation Plans, or "SIPs." 42 U.S.C. § 7521(m)(3). Third, the Act has one
3  OBD systems–related prohibition that applies generally (and not only to
4  manufacturers or States, as with the two requirements described above).
5  Specifically, Title II prohibits anyone from "remov[ing] or render[ing] inoperative
6  any device or element of design installed on or in a motor vehicle . . . in compliance
7  with regulations under this subchapter"—also known as the tampering prohibition.
8  42 U.S.C. § 7522(a)(3)(A). Further, Title II prohibits manufacturing, selling, or
9  installing parts or components principally designed "to bypass, defeat, or render
10  inoperative any device or element of design installed on or in a motor vehicle or
11  motor vehicle engine"—also known as the "defeat device" prohibition. 42 U.S.C. §
12  7522(a)(3)(B). In Title II Congress expressly provided that violators of 42 U.S.C. §
13  7522(a)(3)(A) and (B) face ***civil penalties***, which, for those who are not
14  manufacturers or dealers, such as the Owenses here, are capped at $2,500 per vehicle
15  or component. *Id.* § 7524(a).

16      **C.    The Government inexplicably changes its position on criminal
17          enforcement of Title II in 2020.**

18      Until around December 2020, the government recognized that violations of
19  Title II—including selling OBD system "defeat devices"—were subject only to civil
20  penalties. Congress demonstrated its intent when it amended the Act in 1977 and
21  1990. With respect to the 1977 amendments, the House of Representatives reported
22  that, whereas stationary source violations (under Title I) were subject to criminal

23

24  _____

25  The Act only requires manufacturers to "install" OBD systems in new light-duty vehicles. With respect to heavy-duty vehicles, Congress delegated to EPA whether to require the installation of OBD systems, 42 U.S.C. § 7521(m)(1), and EPA regulations only require installation of OBD
26  systems in heavy-duty vehicles at or below 14,000 pounds gross vehicle weight rating ("GVWR"), for 2005 and newer models, *see* 40 C.F.R. §§ 86.1801–12, 86.1806–17, 86.1806–27, 1036.110.

1   penalties, "***no criminal sanctions were provided for violation of mobile source–***

2   ***related regulations.***" H.R. Rep. No. 95-294, at 69 (1977) (emphasis added).

3          When Congress revised the Act in 1990, it again declined to criminalize the

4   conduct charged here. First, Congress increased the criminal penalty in Section

5   7413(c)(2)(C) from a misdemeanor to a felony. But Congress did not make any

6   changes to that section to expand its scope to include OBD system technology—that

7   is, to criminalize the conduct alleged in the Indictment. Second, Congress directed

8   EPA in Section 7521 to establish regulations requiring motor vehicle manufactures

9   to install "diagnostics systems" (*i.e.*, OBD systems) on new cars and trucks. But

10  Congress did not define "diagnostics systems" as "monitoring devices or methods"

11  or use the term "monitor" anywhere in the text of that section. In fact, in connection

12  with similar proposed amendments in 1989, EPA drafted a section-by-section

13  analysis, including with respect to Section 7413(c)(2)(C), stating the provision "is

14  amended to ensure that administrative, civil, judicial, and criminal sanctions may be

15  imposed for any violation of any requirement of ***titles I, III, IV or V of the Act***."

16  EPA, *Clean Air Act Amendments of 1989, Section-By-Section Analysis* (July 1989),

17  https://nepis.epa.gov/Exe/ZyPDF.cgi/90060800.PDF?Dockey=90060800.PDF

18  (emphasis added). ***Again, Congress expressly excluded Title II.*** *See* S. Rep. No.

19  101-228, at 360 (1990) (stating the 1990 amendments "provide[] criminal fines and

20  imprisonment for 'any person who knowingly violates any requirement or

21  prohibition of ***titles I, III [and] IV***' of the Act." (emphasis added).)

22          Consistent with this congressional action, in 1993, the Acting Director of

23  EPA's Criminal Enforcement Counsel Division noted the following about the

24  criminal enforcement of the 1990 amendments:

25          Automobile dealer or repair shop tampering with automotive air
            emission systems still cannot be prosecuted criminally under the CAA
26          since the mobile source regulations impose various compliance

certification responsibilities only on automobile manufacturers and not on the dealers.

Kathleen A. Hughes, EPA Memorandum to Regional Criminal Enforcement Counsels, re: New Criminal Enforcement Responsibilities Under 1990 Clean Air Act Amendments (Apr. 19, 1993). As recently as 2016, when the government charged Volkswagen for installing defeat devices in the OBD systems of diesel vehicles, neither Volkswagen nor its agents were criminally charged with violating emissions requirements of the Act—rather, they were charged with making false statements, conspiracy, and obstruction of justice. *E.g.*, *United States v. Dorenkamp*, 2018 WL 3127224 (Fifth Superseding Indictment) (E.D. Mich. 2018).

This changed in December 2020, when the government began asserting—for the first time and without any intervening amendment to the Act—that the sale of defeat devices constituted a criminal offense under the Act. EPA, EPA-300-F-20-001, *Enforcement Alert: Aftermarket Defeat Devices and Tampering are Illegal and Undermine Vehicle Emissions Controls*, at 4–5 (Dec. 2020), https://www.epa.gov/sites/default/files/2020-12/documents/tamperinganddefeatdevices-enfalert.pdf. Moreover, because Title II (*i.e.*, the title relating to mobile sources) has no provision for criminal enforcement, the government here needed to "borrow" from Title I (which relates to stationary sources). In particular, the charging language for Count One cites to a Title I provision that, by its terms, does not apply to mobile sources. (Indictment ¶ 43 (citing 42 U.S.C. § 7413(c)(2)).)

Thus, the government's new theory is that an OBD system is a "monitoring device" "required to be maintained . . . under this chapter" such that the sale of parts that modify an OBD system is a felony. This, of course, is based on the new-found criminal enforcement authority first announced in December 2020 by way of the sub-regulatory "Enforcement Alert." Putting aside that a bureaucratic

1  pronouncement posted on EPA's website can't form the basis for a criminal charge,

2  somewhat amazingly the conspiracy period alleged in the Indictment goes back to

3  *2015, five years before the "Enforcement Alert" was even issued*.

4      **D.    The government—apparently based on the "Enforcement Alert"—**
5      **attempts to transform civil violations into the felonies.**

6          The Indictment charges Defendantswith six counts, including two counts of

7  conspiracy to violate the Act and to smuggle goods in violation of 18 U.S.C. § 371,

8  42 U.S.C. § 7413(c)(2)(C), and 18 U.S.C. § 545 (Counts One and Two); three counts

9  of smuggling goods into the United States in violation of 18 U.S.C. § 545 and 18

10  U.S.C. § 2 (Counts Three through Five); and one count of conspiracy to engage in

11  monetary transactions in property derived from specified unlawful activity in

12  violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h) (Count Six). The crux of the

13  allegations in the Indictment is that Defendants and other co-conspirators:

14          [C]onspired to illegally smuggle "defeat devices" that are designed to
            violate, and that are prohibited by, the Clean Air Act into the United
15          States from Canada, and further conspired to violate the Clean Air Act
            by distributing and using those defeat devices to tamper with federally-
16          mandated monitoring devices on diesel trucks.

17  (Indictment ¶ 2.) Specifically, the government alleges these "defeat devices" violate

18  the Act by tampering with a motor vehicle's OBD system, which ensures the

19  "emissions control systems continue to operate properly." (*Id.* ¶¶ 16, 15–25.)

20          The government alleges that "[r]eprogramming an OBD to prevent it from

21  detecting the removal or disabling of emission control systems components

22  constitutes tampering with and rendering inaccurate a monitoring device required

23  under the Clean Air Act and is a felony under the Clean Air Act. 42 U.S.C. §

24  7413(c)(2)(C)." (*Id.* ¶ 26.) As explained below, the government ignores that ***this***

25  ***section of the Act does not regulate motor vehicles***—it appears in an entirely

26  different title of the Act that sets forth requirements for ***stationary sources***. But then,

1   in the next paragraph of the Indictment, the government specifically references a
2   different section of the Act that does in fact regulate motor vehicles, but which
3   imposes only *civil* penalties for selling defeat devices, *i.e.*, the conduct charged in
4   the Indictment. (*Id.* ¶ 27 (citing 42 U.S.C. § 7522(a)(3)(B).)

5       The government's approach to pleading is akin to ordering from a Chinese
6   menu—choose one from Column A and one from Column B. In Paragraph 26 of the
7   Indictment, the government takes a provision from Title I (which the government
8   knows does not apply to mobile sources) and boldly (but irrelevantly) announces
9   that its violation constitutes a "felony under the Clean Air Act." Then, in Paragraph
10  27, it gets around to citing a Title II provision but, notably, does not describe a
11  violation of that provision as a "felony"—because it isn't. But, apparently, through
12  this sleight of hand, the government hopes that the reader will read these consecutive
13  paragraphs of the Indictment together (and quickly) and conclude that *everything*
14  the government alleges constitutes a felony under the Act.

15      With respect to the smuggling charges contained in Counts Three through
16  Five, the government alleges that Defendants "knowingly, intentionally and
17  fraudulently import[ed and brought] into the United States merchandise contrary to
18  law," without actually identifying which "law" the alleged importation was
19  "contrary to." (*Id.* ¶ 56.) Finally , in Count Six, the government alleges that
20  Defendants engaged in a money laundering conspiracy by conspiring to conduct a
21  financial transaction affecting interstate commerce involving the proceeds of a
22  specified unlawful activity, *i.e.*, smuggling goods into the United States in violation
23  of 18 U.S.C. § 545, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h).

24                    **IV.   <u>LEGAL STANDARD</u>**

25      Before trial, a defendant may challenge the sufficiency of an indictment for
26  failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment must be

1  "a plain, concise, and definite written statement of the essential facts constituting the
2  offense charged." Fed. R. Crim. P. 7(c)(1). It must also set out "the elements of the
3  charged crime in adequate detail to inform the defendant of the charge and to enable
4  him to plead double jeopardy." *United States v. Buckley*, 689 F.2d 893, 896 (9th Cir.
5  1982). "A motion to dismiss an indictment can be determined before trial 'if it
6  involves questions of law rather than fact.'" *United States v. Castaneda-Nicolas*, 535
7  F. Supp. 3d 1059, 1067 (E.D. Wash. 2021) (quoting *United States v. Shortt
8  Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986)).

9      "It is generally sufficient that an indictment set forth the offense in the words
10 of the statute itself." *Hamling*, 418 U.S. at 117. However, for such an indictment to
11 be proper, the statute's words must "fully, directly, and expressly, without any
12 uncertainty or ambiguity, set forth all the elements necessary to constitute the
13 [offense] intended to be punished." *Id.* (internal citations omitted). Ambiguity as to
14 the offense intended to be punished is not permissible—an indictment must set out
15 "the particulars" when generic terms are included in the statement of an offense. *See
16 Russell v. United States*, 369 U.S. 749, 765–66 (1962). This requirement rests on
17 "basic principles of fundamental fairness" that "retain their full vitality under
18 modern concepts of pleading" and under the FRCRP. *Id.* Critically, when lacking
19 clear and unambiguous terms, "the ambit of criminal statutes should be resolved in
20 the favor of lenity." *United States v. Bass*, 404 U.S. 336, 347 (1971).

21      **V.    THE CLEAN AIR ACT COUNTS MUST BE DISMISSED**

22      **A.    OBD systems are not "required to be maintained" under the Act,
23           and thus the Act does not criminalize tampering with them.**

24      The Act criminalizes "tamper[ing] with . . . any monitoring device . . .
25 ***required to be maintained*** . . . under this chapter." 42 U.S.C. § 7413(c)(2)(C)
26 (emphasis added); *see United States v. La. Pac. Corp.*, 908 F. Supp. 835, 845 (D.

MOTION TO DISMISS INDICTMENT - PAGE 10

1    Colo. 1995) (recognizing "required to be maintained" is a requirement under Section

2    7413(c)(2)(C) in prosecution of plywood mill owners charged with tampering with

3    pollution "monitoring devices"). The Act contains no requirement that anyone—not

4    a manufacturer, service provider, or owner—maintain an OBD system.

5        As explained above, the Act only requires manufacturers to "install" OBD

6    systems in light-duty vehicles. 42 U.S.C. § 7521(m)(1). But "install" does not mean

7    "maintain." *See United States v. Thomsen*, 830 F.3d 1049, 1057 (9th Cir. 2016) ("We

8    interpret statutory terms in accordance with their ordinary meaning, unless the

9    statute clearly expresses an intention to the contrary.") (citation omitted). To

10   "install" refers to a specific act, *i.e.*, "to set up for use or service."[2] It does not mean

11   an ongoing obligation that persists beyond the completion of the installation. *See*

12   *Massy v. United States*, 214 F.2d 935, 938–39 (8th Cir. 1954) (collecting cases

13   defining the term "install"). For that reason, Congress imposed a deadline or defined

14   period for the installation of something at multiple points in the Act. *E.g.*, 42 U.S.C.

15   § 7412(f)(4)(B) (permitting EPA to grant a waiver for a period "necessary for the

16   installation of controls").

17       To "maintain," on the other hand, means "keeping [something] in a state of

18   repair, efficiency, and/or validity." *United States v. Korotkiy*, 118 F.4th 1202, 1210–

19   11 (9th Cir. 2024). When the Act uses the term "maintain," it consistently imposes

20   an obligation on ***someone*** to keep ***something*** in proper working order. *See, e.g.*, 42

21   U.S.C. § 7414(a)(1) (listing specific persons subject to maintenance requirements

22   for records and monitoring equipment). For instance, Congress granted EPA on-site

23   inspection rights on "any premises . . . in which any records ***required to be***

24

25

26   [2] *Install*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/install (last visited Oct. 2, 2025).

1  *maintained* under paragraph (1) of this section are located." 42 U.S.C. §
2  7414(a)(2)(A) (emphasis added).

3       Indeed, Congress used "install" and "maintain" separately elsewhere in the
4  Act. *E.g.*, 42 U.S.C. §§ 7410(a)(2)(F)(i) ("the ***installation***, ***maintenance***, and
5  replacement of equipment") (emphasis added); 7414(a)(1)(C) ("***install***, use, and
6  ***maintain*** such monitoring equipment") (emphases added); 7432(b)(2) ("purchasing,
7  ***installing***, operating, and ***maintaining*** infrastructure needed to charge, fuel, or
8  maintain zero-emission vehicles") (emphases added). Congress therefore could not
9  have intended "install" and "maintain" to have the same meaning. *Ysleta del Sur*
10 *Pueblo v. Tex.*, 596 U.S. 685, 698 (2022) (following the "usual rule" of interpretation
11 that disfavors "ascribing to one word a meaning so broad that it assumes the same
12 meaning as another statutory term"). Simply imposing civil penalties for tampering
13 with OBD systems does not create an affirmative requirement to "maintain" them.
14 *Id.* at 696–97 (noting the "dichotomy between prohibition and regulation" was
15 "almost impossible to ignore" where Congress used prohibitory language in one
16 provision and regulatory language in another).

17      The district courts to consider the government's novel assertion of criminal
18 authority under Section 7413(c)(2)(C) each failed to analyze whether OBD systems
19 are "required to be maintained" under the Act. *See United States v. Coiteux*, 2024
20 WL 1998417, at *4 (W.D. Wash. 2024), *appeal docketed* Case No. 24-6945 (9th Cir.
21 2024); *United States v. Carroll*, 2024 WL 4039807, at *1–2 (E.D. Mo. 2024)
22 (adopting *Coiteux*'s reasoning on motion *in limine* without independently analyzing
23 the issues); *United States v. Long*, 2024 WL 4711946, at *4–5 (E.D. Va. 2024). The
24 district courts in *Coiteux* and *Long* both incorrectly state that Section 7413(c)(2)(C)
25 "allows criminal penalties for tampering with ***any*** monitoring device required by
26 ***any*** part of the CAA." *Coiteux*, 2024 WL 1998417 at *4 (emphasis in original);

*Long*, 2024 WL 4711946, at *4 ("the statute covers '***any*** monitoring device or method' that the CAA requires") (emphasis in original).

Not so. Section 7413(c)(2)(C) explicitly only covers "any monitoring device" that is "required to be maintained" under the Act. But, as discussed above, the Act only requires OBD systems be installed—and a maintenance requirement is distinct from an installation requirement.

**B.    OBD systems are not "monitoring devices" under the Act, and thus the Act does not criminalize tampering with them.**

Under the Act, the term "monitoring device" has a specialized meaning. *Van Buren v. United States*, 593 U.S. 374, 388 n.7 (2021) ("[W]hen a statute . . . is 'addressing a . . . technical subject, a specialized meaning is to be expected.'") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)). The term refers to equipment that monitors emissions or data of emission output. *E.g.*, 42 U.S.C. §§ 7403(c) ("monitoring . . . air pollutants"); 7403(e) ("monitoring systems and networks for evaluating and quantifying exposure to and effects of multiple environmental stresses associated with air pollution"); 7403(j)(3)(B)(i) ("continuous monitoring of emissions of precursors of acid deposition"); 7410(a)(2)(B)(i) ("monitor, compile, and analyze data on ambient air quality"); 7412(b)(5) ("monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants"). EPA regulations support this technical meaning. 40 C.F.R. § 64.1 (defining "monitoring" in reference to various "data collection techniques," including "continuous emission or opacity monitoring systems" and "maintenance and analysis of records of fuel or raw materials usage," among others). It follows that "monitoring devices" under Section 7413(c)(2)(C) monitor emissions or track emissions data. According to the government's own allegations, OBD systems do neither.

1   Rather, according to the Indictment, OBD systems "ensure that both the
2   emissions-monitoring computer software and the hardware emissions control
3   devices of vehicles are functioning properly." (Indictment ¶ 18.) As the government
4   concedes, OBD systems do not measure actual emissions. Instead, they determine
5   whether a given emissions-related component or system is "malfunctioning" and, if
6   it is, alert the driver through illumination of a check-engine light. (*Id.* ¶ 17.) Congress
7   understood as much when it amended the Act, characterizing an OBD system as "an
8   onboard computer and memory system which is used to monitor and control engine
9   systems." *See* S. Rep. No. 101-228, at 97 (1990). In short, an OBD system may
10  monitor ***something***, but it does not monitor ***emissions***. *Id.* (OBD systems are
11  intended to "monitor[] and diagnos[e]" problems with the "catalyst, oxygen sensor,
12  exhaust gas recirculation system, evaporative emission control system, auxiliary air
13  system, and the fuel metering and ignition systems" as well as "potential coolant
14  leaks from those vehicle air conditioning systems").[3]

15  The district court decisions in *Coiteux* and *Long* ignore this crucial distinction
16  and instead adopt the government's overbroad definition, which it arrived at by
17  mashing together the separate definitions for "monitoring" and "device." *Coiteux*,
18  2024 WL 1998417 at *3 (OBD systems "perform[] the special function to keep track
19  of and check the emissions of vehicles"); *Long*, 2024 WL 4741916, at *4. This
20  erroneous approach is unfaithful to the Act, which makes clear that "monitoring
21  devices" monitor actual emissions or data relating to emission output, not simply the
22  vehicle's engine control systems.

23

24

25  _____

26  [3] Vehicles have many "devices" that "monitor" things, such as components that tell the driver if a door, hatch, or trunk is ajar. In some sense that's a "monitoring device," but it isn't monitoring what the Act speaks to when it uses the term "monitor," namely, emissions or air pollutants.

MOTION TO DISMISS INDICTMENT - PAGE 14

**C.    The Act, read in its entirety, cannot be interpreted to criminalize the charged conduct**

    **1.    By its own terms, Section 7413 does not apply to conduct regulated under Title II.**

Section 7413, interpreted in its entirety, confirms that Section 7413(c)(2)(C) does not apply to the sale of OBD-system modifying parts under Title II. As noted above, in another part of Section 7413—Section 7413(a)(3)(D)—Congress expressly listed the subchapters (*i.e.*, Titles) of the Act for which EPA can seek a criminal referral. ***Title II is omitted from this list.*** This omission illuminates that Congress did not intend to criminalize Title II violations using Section 7413(c)(2)(C), which is why it did not authorize EPA to make criminal referrals for that same conduct.

Moreover, in Section 7413(f) (part of Title, or subchapter, I), Congress authorized EPA to pay an award for information leading to a "criminal conviction" for "any violation of this subchapter or subchapter III, IV-A, V, or VI of this chapter ***enforced under this section***." (emphasis added). Congress omitted Title II from the list of provisions "enforced under this section," *i.e.*, Section 7413, because it understood that Title II violations would not be enforced under Section 7413. Rather, they would be ***civilly*** enforced under Section 7524 in Title II. Again, Congress could not have intended to criminalize the sale of OBD-system modifying parts while at the same time preventing EPA from paying informants in such cases.

    **2.    Section 7413(c)(2)(C)'s "under this chapter" language is too thin a reed on which to grant the government the expansive criminal prosecution authority it seeks.**

Against all this evidence that Section 7413(c)(2)(C) was never intended to be used to prosecute violations of Title II for which there are separate civil penalty provisions, the government will no doubt point to Section 7413(c)(2)(C)'s "under this chapter" phrase, as it did in *Coiteux* and *Long*. *Coiteux*, 2024 WL 1998417 at

*2; *Long*, 2024 WL 4711946, at *4. But "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *W. Va. v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted). Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). As explained above, for thirty years two separate branches of government told the public that selling parts that tamper with OBD systems was not criminal. Now, the government has made an about-face with real-life criminal consequences for the Owenses.

In such circumstances, the government "must point to clear congressional authorization for the power it claims," not merely a "plausible textual basis" for its action. *W. Va.*, 597 U.S. at 723; *see also FDA v.* Brown *& Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) ("In extraordinary cases . . . there may be reason to hesitate" before accepting a reading of a statute that would, under more ordinary circumstances, be upheld.). The phrase "under this chapter" is too thin a reed to supply the government here with the extraordinary power to change its thirty-year-old enforcement practice.

Further, to the extent any doubt persists about the best way to read the Act, the rule of lenity requires the court to resolve it in favor of Defendants. *United States v. Bittner*, 598 U.S. 85, 103 (2023); *United States v. Bass*, 404 U.S. 336, 347–49 (1971); *United States v. Hardy*, 289 F.3d 608, 614 (9th Cir. 2002). Again, for years two separate branches of government told the public that OBD system tampering was not criminal. The only warning that tampering with an OBD system could be a crime appears in the Enforcement Alert. Congress never amended the Act to make tampering with an OBD system a crime, and there are no final regulations that mention criminal liability. In fact, the opposite is true. EPA's own regulations

specify that violating 42 U.S.C. § 7522 may result in civil or administrative penalties, but not a criminal penalty. 40 C.F.R. § 1068.125. EPA confirmed this position when it published a final rule on January 24, 2023, that refers to tampering several times throughout but makes no reference to criminal liability for tampering. 88 Fed. Reg. 4296, 4556 (2023) (adding 40 C.F.R. § 1036.825). There should be no doubt that EPA is bound by its own regulations. *See Nat'l Envtl. Dev. Corp. v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). Nor should there be any doubt that EPA cannot impose criminal liability if Congress has not created that liability.[4]

Thus, even if Section 7413(c)(2)(C) does allow the government's about-face, ambushing Defendants with it violates the due process concerns "protect[ed]" by the rule of lenity. *See Bittner*, 598 U.S. at 103 ("If many experienced accountants were unable to anticipate the government's current theory, we do not see how 'the common world' had fair notice of it."). Indeed, where "the government has repeatedly issued guidance to the public at odds with the interpretation it now asks us to adopt" that "surely []counts as one more reason yet to question whether its current position represents the best view of the law." *Id.* at 97.

If anything, the fact that the government has changed its view shows there is a fair reading of Section 7413(c)(2)(C) that differs from the one the government is advancing today. *E.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *Bittner*, 598 U.S. at 97 ("[C]ourts may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it

---

[4] *W. Va.*, 597 U.S. at 723; *see also Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) ("It is central to the real meaning of the rule of law . . . that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so.").

1    proffers in court."). The Court should therefore reject the government's expansive

2    reading of Section 7413(c)(2)(C) and apply the rule of lenity to resolve the

3    interpretive issue in Defendants' favor.

4        **3.    The government's new-found felony theory would lead to absurd results.**

5

6        Finally, the government's novel interpretation that Section 7413(c)(2)(C)

7    imposes a felony for OBD system tampering also leads to absurd results. For

8    example, knowingly ripping out the catalyst and every other piece of a vehicle's

9    emissions control system only gives rise to civil liability under Title II, but disabling

10   a vehicle's check engine light is a felony.

11       The absurdity of this felony theory is further illustrated by the agency's own

12   regulations at the time of the Owenses' alleged criminal conduct occurred. Despite

13   bringing a felony count against the Owenses, the federal government largely does

14   not administer the OBD system program. Decades ago, EPA approved regulations

15   that allow the State of California, specifically the California Air Resources Board

16   ("CARB"), to administer the OBD system program. *See, e.g.*, 42 U.S.C. § 7543(b);

17   California State Motor Vehicle Pollution Control Standards; Waiver of Federal

18   Preemption; Decision, 61 Fed. Reg. 53,371 (Oct. 11, 1996).

19       With EPA's imprimatur, CARB's OBD system regulations in effect at the

20   time of the Owenses' alleged criminal conduct allowed manufacturers to bring to

21   market and to sell cars and trucks without fully functioning OBD systems, provided

22   the manufacturer pays California a civil OBD "deficiency" fine. *E.g.*, 40 C.F.R. §

23   86.1806–17; 13 Cal. Code Regs. § 1968.2(k) (authorizing CARB to grant

24   "deficiencies" to manufacturers allowing them to certify a vehicle even if portions

25   of the vehicle's OBD system cannot effectively diagnose certain component failures

26   in the emissions control system). Yet, under the government's theory, a small repair

1   shop or technician could face prison for conduct far less severe. This inconsistency
2   is not just irrational; it reveals the inequity of criminalizing minor actors while
3   regulatory agencies treat large-scale violations by industry giants as civil infractions.
4   It also shows that the government's proffered interpretation of the Act is wrong.

5       **VI.**    <u>**THE SMUGGLING COUNTS MUST BE DISMISSED**</u>

6           With respect to the smuggling charges, the government itself does not believe
7   the importation of the subject parts is against the law. In the Indictment, the
8   government alleges in Counts Three through Five that Defendants "did knowingly,
9   intentionally, and fraudulently import and bring into the United States merchandise
10  contrary to law . . . . All in violation of 18 U.S.C. § 545, 2." The Indictment does not
11  specify which law the alleged conduct was "contrary to," nor can it. The reason is
12  simple: Although Title 42, United States Code, Section 7522(a)(3)(B) prohibits
13  ***manufacturing, selling, and installing*** defeat devices and delete tuners, it does not
14  prohibit the ***importation of them into the United States***. To wit, the government
15  itself admits, in internal pre-indictment emails (May 2024) and internal post-
16  indictment emails (March 2025) that the *importation of the subject parts is not*
17  *illegal*. (Exs. A and B). Further, even if Section 7522 prohibited importation of
18  defeat devices or delete tuners, that provision nonetheless could not serve as the
19  predicate for a smuggling charge because it imposes civil, not criminal, liability.
20  *United States v. Izurieta*, 710 F.3d 1176, 1184 (11th Cir. 2013); *see also United*
21  *States v. Alghazouli*, 517 F.3d 1179, 1187 (9th Cir. 2008) (holding the term "law" in
22  Section 545 "includes a regulation only if there is a statute (a 'law') ***that specifies***
23  ***that violation of that regulation is a crime***" (emphasis added)).

24
25
26

> **Commented [SC1]:** Check citation please.

1

**A.**    **Smuggling is prohibited by Title 18, United States Code, Section 545, which requires the importation be "contrary to law."**

2

3    "Smuggling Goods into the United States" is prohibited by 18 U.S.C. § 545,

4    which provides in relevant part:

5        Whoever fraudulently or knowingly imports or brings into the United
         States, any merchandise contrary to law, or receives, conceals, buys,

6        sells, or in any manner facilitates the transportation, concealment, or
         sale of such merchandise after importation, knowing the same to have

7        been imported or brought into the United States contrary to law—

8    Section 545 thus "prohibits fraudulent or knowing importation of merchandise

9    '***contrary to law***,'" as well as "the receipt, concealment, or sale of merchandise" or

10   facilitation thereof "which the defendant knows to have been imported '***contrary to***

11   ***law***.'" *Alghazouli*, 517 F.3d at 1182 (emphasis added). The "essential elements" of

12   a violation of this provision are: "(1) defendant fraudulently or knowingly, (2)

13   imported or brought into the United States, (3) any merchandise, (4) contrary to

14   law." *Olais-Castro v. United States*, 416 F.2d 1155, 1158 (9th Cir. 1969).

15   To be "contrary to law," there must be a specific statute or regulation

16   restricting, preventing, or prohibiting the importation. *E.g.*, *Alghazouli,* 517 F.3d at

17   1183 (violation of 40 C.F.R. § 82.4, which "prohibits the importation of 'class I'

18   controlled substances"); *Olais-Castro*, 416 F.2d at 1158–59 ("assuming a narcotic

19   drug is merchandise, its importation was prohibited by 21 U.S.C. § 173"); *Roseman*

20   *v. United States*, 364 F.2d 18, 26 (9th Cir. 1966) ("contrary to law" requires that

21   defendant must have "violated another existing law in force at the time").

22   Under well-established Ninth Circuit law, "'***[t]he term [law] includes a***

23   ***regulation only if there is a statute (a law) that specifies that violation of that***

24   ***regulation is a crime***.'" *United States v. Lawson*, 618 F. Supp. 2d 1251, 1257 (E.D.

25   Wash. 2009) (emphasis added) (quoting *Alghazouli*, 517 F.3d at 1187), *aff'd*, 377 F.

26

App'x 712 (9th Cir. 2010).[5] Moreover, the Ninth Circuit's holding in *Alghazouli* aligns with the Eleventh Circuit's holding in *Izurieta* that a law or regulation "fails to qualify as a 'law' for purposes of criminal liability under 18 U.S.C. § 545" where "that law is civil only." *Izurieta*, 710 F.3d 1184.

> **B.    The smuggling charge here fails because the government cannot identify any law prohibiting the "importation" of defeat devices or delete tuners, let alone a criminal law prohibiting such importation.**

As an initial matter, the Indictment fails to identify a predicate law for the "contrary to law" element of Counts Three through Five. This is fatal and necessitates dismissal of the Indictment. *Olais-Castro*, 416 F.2d at 1158 n.8 ("[F]or an indictment charging a violation of [paragraph 2] of section 545 to be sufficient, it ***must allege which law the defendant's action was contrary to***." (emphasis added)); *accord Current v. United States*, 287 F.2d 268, 269 (9th Cir. 1961) ("Appellant urges that merely to charge a person with violation of a statute 'contrary to law' is insufficient to state an offense. We agree."); *Keck v. United States*, 172 U.S. 434, 437 (1899) (holding the words "contrary to law" in § 545 did not apprise defendant of the nature of the charge without reference to an additional statute).

Even if the government did attempt to obtain a superseding indictment, it cannot as a matter of law identify any provision of the CAA or a regulation promulgated thereunder that criminalizes the conduct charged for two reasons.

*First*, Section 7522 cannot serve as the predicate offense to a smuggling charge, because it does not prohibit the importation of the defeat devices and delete

---

[5] While Ninth Circuit law is that violation of a regulation can be "contrary to law" ***if*** a statute makes a violation thereof a crime, there is otherwise a circuit split on the issue. *See, e.g.*, *United States v. Sterling Islands, Inc.*, 391 F. Supp. 3d 1027, 1042 (D.N.M. 2019) ("The Fourth, Ninth, and Eleventh Circuits have split whether regulations constitute laws for the purposes of 18 U.S.C. § 545's 'contrary to law' requirement. The Tenth Circuit has not reached the issue."). Nevertheless, the Indictment here does ***not*** allege the violation of a predicate statute or regulation for the "contrary to law" requirement.

1    tuners at issue here. In other words, even if the Court were to accept as true every

2    allegation in the forty-seven-page Indictment, nowhere is it alleged that the

3    Defendants "imported or brought into the United States . . . any merchandise . . .

4    contrary to law." *Olais-Castro*, 416 F.2d at 1158. The reason for this is simple: the

5    CAA does not prohibit the importation or bringing into the United States defeat

6    devices or delete tuners—it merely prohibits manufacturing, selling, or installing

7    them. Specifically, Section 7522(a)(3)(B) makes it illegal:

8    
9    > [F]or any person to ***manufacture or sell, or offer to sell, or install***, any
10   > part or component intended for use with, or as part of, any motor vehicle
11   > or motor vehicle engine, where a principal effect of the part or
     > component is to bypass, defeat, or render inoperative any device or
     > element of design installed on or in a motor vehicle or motor vehicle
11   > engine in compliance with regulations under this subchapter, and where
     > the person knows or should know that such part or component is being
12   > offered for sale or installed for such use or put to such use.

13   42 U.S.C. § 7522(a)(3)(B) (emphasis added).

14          Section 7522 therefore does not prohibit the ***importation*** of the defeat devices

15   and delete tuners alleged to be involved in this case. This is fatal to the Indictment.

16   *See Steiner v. United States*, 229 F.2d 745, 747–48 (9th Cir. 1956). In *Steiner*, the

17   government charged the defendants with violating Section 545 by importing parrots

18   into the United States. *Id.* On appeal, the Ninth Circuit held that the indictment was

19   insufficient because it failed to state what law, other than Section 545, the

20   importation was contrary to, and "[t]here was not at any pertinent time any law

21   absolutely prohibiting the importation of [parrots]." *Id.* at 548, n.7; *see also United

22   States v. White*, 87 F. App'x 566, 573 (6th Cir. 2004) (finding indictment alleging

23   violation of Section 545 insufficient where it failed to allege which law importation

24   of firearm magazines violated, but affirming conviction under plain error standard);

25   *United States v. Teh*, 535 F.3d 511, 516–20 (6th Cir. 2008) (affirming sufficiency of

26

1   indictment alleging violation of Section 545 only upon finding the defendant

2   violated law that criminalized the import of counterfeit DVDs).

3       *Second*, no regulation promulgated under the CAA prohibits the importation

4   of the alleged defeat devices, and even if one did, there is no statute that specifies

5   that violation of the regulation constitutes a crime, as required under Ninth Circuit

6   precedent. *Alghazouli*, 517 F.3d at 1187; *United States v. Lawson*, 377 F. App'x 712,

7   716 (9th Cir. 2010). Applicable regulations are included within Title 40, Part 85, of

8   the Code of Federal Regulations, which regulates "motor vehicles offered for

9   importation or imported into the United States." 40 C.F.R. § 85.1501(a). In general,

10  Part 85 governs the importation of a "vehicle or engine," and thus is not applicable

11  to the alleged defeat devices or delete tuners. 40 C.F.R. § 85.1503.

12      Nor does any other part of the C.F.R. prohibit the alleged importation of defeat

13  devices. Pursuant to Part 1068, "***engines/equipment*** that you import must be covered

14  by a certificate of conformity unless they were built before emission standards

15  started to apply." 40 C.F.R. § 1068.301(b). However, alleged defeat devices and

16  delete tuners do not meet the regulatory definition of "equipment," which is defined

17  to mean "(1) Any ***vehicle, vessel, or other type of equipment*** that is subject to the

18  requirements of this part or that uses an engine that is subject to the requirements of

19  this part. An installed engine is part of the equipment . . . ." or "(2) ***Fuel-system***

20  ***components*** that are subject to an equipment-based standard under this chapter.

21  Installed fuel-system components are also considered part of the engine/equipment

22  to which they are attached." 40 C.F.R. § 1068.30 (emphases added); *see also id.*

23  (further noting that "[p]iece of equipment means any vehicle, vessel, locomotive,

24  aircraft, or other type of equipment equipped with engines to which this part

25  applies"); *accord* 40 C.F.R. § 1036.115(h) ("A defeat device is an auxiliary emission

26

MOTION TO DISMISS INDICTMENT - PAGE 23

1    control device (AECD) that reduces the effectiveness of emission controls under

2    conditions that may reasonably be expected in normal operation and use.").

3        In any event, violation of these regulations only give rise to civil liability

4    under Section 7522, which is civil in nature. *See* 40 C.F.R. § 1068.335(a)

5    ("importation of nonconforming engines/equipment violates sections 203 and

6    213(d) of the Clean Air Act (42 U.S.C. 7522 and 7547(d)"); 40 C.F.R. § 85.1513(a)

7    ("importation of a motor vehicle or motor vehicle engine which is not covered by a

8    certificate of conformity other than in accordance with this subpart . . . is prohibited,"

9    and "[f]ailure to comply with this section is a violation of section 203(a)(1) of the

10   Act"). Under Ninth Circuit law, this will not suffice. *E.g.*, *Alghazouli*, 517 F.3d at

11   1187. In point of fact, in *Alghazouli* the government based its smuggling charges on

12   violation of a regulation promulgated under a different title of the CAA (relating to

13   stratospheric ozone control) that explicitly provided for criminal enforcement. *Id.* at

14   1188. Violation of the regulations at issue here carry no criminal consequences.

15       In sum, Section 545 cannot be used to criminalize statutes that provide for

16   civil penalties. This is the precise issue the Eleventh Circuit faced in *Izurieta*. In that

17   case, defendants were charged with violating a customs regulation that gave rise to

18   civil remedies. The Eleventh Circuit held that a regulatory violation carrying only

19   civil implications could not serve as the underlying offense for the smuggling

20   statute's "contrary to law" provision given the felony criminal penalties associated

21   with a violation of Section 545. 710 F.3d at 1183–84. Similarly, the Ninth Circuit in

22   *Alghazouli*, while employing a different test, held that a regulation can serve as the

23   underlying offense "only if there is a statute (a law) that specifies that violation of

24   that regulation is a ***crime***." *Id.* (emphasis added). It follows that, if the charged

25   conduct only violates a law that provides for civil liability, as is the case here, then

26   the underlying offense cannot serve as the basis for prosecution under Section 545.

1    Put another way, the government—realizing that there is no criminal liability

2 under Title II of the CAA, necessitating its reliance on the sub-regulatory

3 Enforcement Alert—is engaged in further bootstrapping by attempting to transform

4 what Congress intended to be, at most, a civil violation into a felony. Not

5 surprisingly, the Ninth Circuit, as well as the majority of the circuit courts to have

6 considered the issue, have rejected such a result, as the Court should do here.

7    In direct contravention to the charged conduct in the Indictment, EPA officials

8 were aware *both pre- and post-indictment* that the importation of auto parts alleged

9 to violate the CAA is not a violation of § 545 because there is no law containing

10 such a prohibition. The government's own internal communications during the

11 investigation of this matter show that it was aware no valid smuggling charge exists.

12 As indicated by Expert Witness Victor Aguilar, EPA Investigator, in cross-agency

13 emails to agents with CBP and EPA: "Finally, ***the EPA violation is not the***

14 ***importation of the product, but the sale of the product to someone in the US***." (Ex.

15 A (emphasis added).) [6] As well as: "Note that we need this invoice because ***the***

16 ***violation is the sale of the product to a US customer, not the importation itself***."

17 (Ex. B (emphasis added).) Yet, the government continues to pursue its theory

18 despite these clear contradictory emails; as such, the smuggling counts must be

19 dismissed.

20 **VII.  THE MONEY LAUNDERING COUNT MUST BE DISMISSED**

21    To establish a money laundering offense, the Government must prove that

22 defendants engaged in a financial transaction to conceal the proceeds of "specified

23

24 ───────────────
6 These emails were included in the government's 13th discovery production, recently disclosed
25 on October 14, 2025 following– and presumably as a result of–Defendants' Motion to Compel.
Defendants specifically requested internal emails between governmental agencies prior to filing
the Motion to Compel, and such communications were produced after the prior motions deadline
26 of October 1, 2025. Defendants anticipate potential further motion practice regarding these emails.
These emails are submitted restricted based upon the Protective Order (ECF No. 86) in this case.

1    unlawful activity." 18 U.S.C. § 1956. According to the Indictment, the specified

2    unlawful activity is the alleged smuggling charged in Counts Three through Five.

3    Since Counts Three through Five must be dismissed, as stated above, there is no

4    basis upon which to support the money laundering charge in Count Six, and

5    therefore, it must be dismissed as well. *E.g.*, *United States v. D'Alessio*, 822 F. Supp.

6    1134, 1146 (D.N.J. 1993) (dismissing money laundering counts following dismissal

7    of underlying mail fraud counts).

8    **VIII.  CONCLUSION**

9        For all of the foregoing reasons, the Indictment should be dismissed.

10

11        RESPECTFULLY SUBMITTED this 27th day of October, 2025.

12

13    ETTER, McMAHON, LAMBERSON,
      VAN WERT & ORESKOVICH, P.C.

14

15    By:    /s/ Andrew M. Wagley
             Andrew M. Wagley, WSBA #50007

16           618 West Riverside Avenue, Suite 210
             Spokane, WA 99201

17           *Attorney for Defendants John Wesley*

18           *Owens and Fulfillment Solutions &*
             *More, LLC*

19

20    HASSAN + CABLES, LLC

21    By:    /s/ Stewart D. Cables

22           Stewart D. Cables, *Pro Hac Vice*
             1035 Pearl Street, Suite 200

23           Boulder, CO 80302

24           *Attorney for Defendants John Wesley*
             *Owens and Fulfillment Solutions &*

25           *More, LLC*

26

HORMEL LAW OFFICE

By:   /s/ Stephen R. Hormel
Stephen R. Hormel
17722 East Sprague
Spokane Valley, WA 99016

*Attorney for Defendants Joshua Wesley Owens and Diesel Truck Products, Inc.*

DUANE MORRIS LLP

By:   /s/ William M. McSwain
William M. McSwain, *Pro Hac Vice*
30 South 17th Street
Philadelphia, PA 19103

*Attorney for Defendants Joshua Wesley Owens and Diesel Truck Products, Inc.*

EPSTEIN BECKER & GREEN PC

By:   /s/ Sarah M. Hall
Sarah M. Hall, *Pro Hac Vice*
1227 25th Street NW 20037, Suite 700
Washington, DC 20037

*Attorney for Defendants Joshua Wesley Owens and Diesel Truck Products, Inc.*

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on the date indicated below, I electronically filed the

3 foregoing document with the Clerk of the Court using the CM/ECF System, which

4 will send notification of such filing to all of the attorneys that have appeared in this

5 case and have registered with the CM/ECF System.

6      EXECUTED this 27th day of October, 2025, in Spokane, Washington.

7

8                              By: /s/ Jodi Dineen

9                                   Jodi Dineen, Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION TO DISMISS INDICTMENT